85 P.3d 1079

A. Joris WATLAND, Eric Gene Schneider, David Atkin, George Atkins, Sherrie Austin, Norman Vernon Bode, Gene Bridges, Richard Burnham, Heather Conahan, Mimi Desjardins, Mark Ewald, Tom Faught, Janine Hearne, John Hearne, Mel R. Hertz, Holly Huber, Wendy Hudson, Robert W. Jackson, Mitch Kahle, Ronette M. Kawakami, Michelle Lau, Pamela Lichty, Philip Lowenthal, Andrea Haksoon–Low, Leilani V. Lujan, Lynn Lundquist, Graham Mottola, Kate Murphy, Paula F. Myers, Susan Nakama, Emanuel B. Ocha, Wilfred Mitsuji Oka, Daniel W. Petersen, Barry Porter, Catherine E. Pruett, Eleanor C. Quemado, Bob Rees, Louis Rosof, Jerry Rothstein, Stephen Sawyer, Mary Anne Scheele, Raymond L. Scheele, Patrick Y. Taomae, Mary Lee Tsuffis, Christopher A. Verleye, David S. Wiltse, and Brenda Whitmarsh, Plaintiffs,

v.

Linda LINGLE, Governor of the State of Hawai'i, in her official capacity; Dwayne D. Yoshina, Chief Election Officer for the State of Hawai'i, in his official capacity; and Ken H. Takayama, Acting Director of the State of Hawai'i Legislative Reference Bureau, in his official capacity, Defendants.

No. 25487.

Supreme Court of Hawai'i.

Feb. 24, 2004.

As Clarified March 19,2004.

Brent T. White and Lunsford Dole Phillips (of the American Civil Liberties Union of Hawai'i Foundation), Honolulu, on the briefs, for plaintiffs.

Aaron H. Schulaner, Russell A. Suzuki, and Charleen M. Aina, Deputy Attorneys General, on the briefs, for defendants.

Charlene M. Aina, Deputy Attorney General, for State Defendants, on the motion.

Susan K. Dorsey and Lunsford Dole Phillips (of American Civil Liberties Union of Hawai'i), Honolulu, for plaintiffs, in response.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; Intermediate Court of Appeals Chief Judge BURNS, Assigned by Reason of Vacancy; and ACOBA, J., concurring separately.

Opinion of the Court by MOON, C.J.

This original proceeding concerns the interpretation of article XVII, sections 2 and 3 of the Hawai'i Constitution, which set forth specific procedures governing the amendment and ratification of proposed constitutional amendments. The plaintiffs, forty-six residents and registered voters in the State of Hawai'i, challenge the validity of a constitutional amendment authorizing the initiation of felony prosecutions by written information [hereinafter, the amendment], which was presented to and approved by a majority of voters in the November 5, 2002 general election [hereinafter, the general election]. The plaintiffs contend that: (1) the ratification process was procedurally invalid inasmuch as the State defendants[1] [hereinafter, the defendants] failed to comply with requirements set forth in the Hawai'i Constitution regarding publication and disclosure of the text of the amendment; and (2) the ratification process was fundamentally flawed (a) inasmuch as the defendants provided voters with misinformation regarding the amendment and (b) due to knowing misconduct by election officials. Inasmuch as the plaintiffs' first contention has merit, we hold that the amendment was not validly ratified in accordance with the mandate of article XVII, sections 2 and 3 of the Hawai'i Constitution. In light of this holding, it is unnecessary to address the plaintiffs' second contention.

## I. BACKGROUND

During the 2002 regular session of the Hawai'i State Legislature, both houses of the legislature passed, by a requisite two-thirds vote, S.B. No. 996, H.D. 1, C.D. 1 [hereinafter, S.B. No. 996], which provides:

A Bill for an Act Proposing Amendments to Article I, Section 10, of the Hawai'i Constitution.

*Be It Enacted by the Legislature of the State of Hawai'i:*

SECTION 1. The purpose of this Act is to propose an amendment to article I, section 10, of the Constitution of the State of Hawai'i to permit prosecutors and the attorney general to initiate felony criminal charges by filing a written information signed by the prosecutor or the attorney general setting forth the charge in accordance with procedures and conditions to be provided by the state legislature.

SECTION 2. Article I, section 10, of the Constitution of the State of Hawai'i is amended to read as follows:

### "INDICTMENT; PRELIMINARY HEARING; INFORMATION; DOUBLE JEOPARDY; SELF–INCRIMINATION

**Section 10.** No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon a finding of probable cause after a preliminary hearing held as provided by law [,] or upon information in writing signed by a legal prosecuting officer under conditions and in accordance with procedures that the legislature may provide, except in cases arising in the armed forces when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy; nor shall any person be compelled in any criminal case to be a witness against oneself."

SECTION 3. The question to be printed on the ballot shall be as follows:

"Shall Hawai'i's constitutional provision regarding the initiation of criminal charges be amended to permit criminal charges for felonies to be initiated by a legal prosecuting officer through the filing of a signed, written information setting forth the

---

1. Following the automatic substitution of various parties during the pendency of this case pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1) (2000), the current State defendants are Governor Linda Lingle, Dwayne D. Yoshina, in his official capacity as Chief Election Officer for the State of Hawai'i, and Ken H. Takayama, in his official capacity as Acting Director of the State of Hawai'i Legislative Reference Bureau.

charge in accordance with procedures and conditions to be provided by the state legislature?"

SECTION 4. Constitutional material to be repealed is bracketed. New constitutional material is underscored.

SECTION 5. This amendment shall take effect upon compliance with article XVII, section 3, of the Constitution of the State of Hawai'i.

According to Wendell Kimura, then-Acting Director of the State of Hawai'i Legislative Reference Bureau (LRB), the LRB prepared voter education material regarding the amendment in accordance with Hawai'i Revised Statutes (HRS) § 11–2(e) (Supp.2001).[2] The LRB's principal sources of information for the voter education material "were the bill [ (S.B. No. 996) ] itself, its accompanying Conference Committee Report No. 51–02, and testimony from persons who supported and opposed the bill's adoption."

On or about July 5, 2002 (within ninety days of the general election as required by HRS § 11–2(e)), Dwayne D. Yoshina, the Chief Election Officer for the State, received the LRB voter education material respecting the amendment. The Office of Elections reprinted the material prepared by the LRB, essentially verbatim, in a voter information pamphlet for distribution in connection with the general election [hereinafter, the voter information pamphlet]. The voter information pamphlet was titled: "Hawai'i Votes: Information on: Three Proposed *Amendments to the Hawai'i State Constitution* on your General Election Ballot *on November 5th!*" The voter information pamphlet in-

cluded, *inter alia*, the actual ballot question regarding the amendment—which was to appear as Question No. 3 on the general election ballot—a "Background" section, an "Explanation of Proposed Amendment" section, and a "Pros and Cons" section. The voter information pamphlet did not include the text of the amendment.

On October 4, 2002, attorney Brook Hart called Yoshina to advise him of alleged inaccuracies relating to the amendment in the voter information pamphlet. In a letter dated October 14, 2002, Aaron Schulaner, deputy attorney general assigned to the Office of Elections, responded in relevant part:

The ballots and the informational materials have already been printed. Absentee voting has also already commenced. We have reviewed your concerns but believe the materials can be defended as written.

According to Yoshina, the voter information pamphlet was mailed to every registered voter household in the State of Hawai'i on October 11 and 15, 2002.[3] Additionally, the LRB voter education material was formatted as a public notice advertisement by the Office of Elections and published in the Honolulu Advertiser and Honolulu Star Bulletin on October 13, 20, and 27, and November 3, 2002, the four consecutive Sundays preceding the general election.

■ We take judicial notice of appeal No. 25410, 2002 WL 31497546, relating to *Watland v. Yoshina*, Civ. No. 02–1–2485–10, filed in the Circuit Court of the First Circuit on October 23, 2002 [hereinafter, the circuit court suit].[4] In the circuit court suit, plain-

---

**2.** HRS § 11–2(e) states in pertinent part that:

(e) Upon the certification of any bill that sets forth a question for vote by the electorate, the chief election officer shall coordinate the preparation of appropriate voter education materials with the legislative reference bureau. The legislative reference bureau shall be responsible for the interpretation of the bill and shall submit to the chief election officer, not later than ninety days prior to the general election, the following items in final form:

(1) A summary, factsheet, and digest of the proposed constitutional amendment, which includes the purpose and intent of the proposed constitutional amendment, and ramifications of the proposed constitutional amendment if ratified by the electorate; and

(2) Arguments for and against ratification of the proposed constitutional amendment.

**3.** Yoshina's declaration further avers that the voter information pamphlet was included in every absentee ballot mailed out for the general election, posted at every general election polling place (including the polling places open for walk-in absentee voting prior to November 5, 2002), and provided to all of the libraries of the Hawai'i Public Library System with a request that the pamphlet be posted on the libraries' bulletin boards.

**4.** The full caption of the case is *A. Joris Watland and Eric Gene Schneider v. Dwayne D. Yoshina, Chief Election Officer for the State of Hawai'i,*

tiffs Watland and Schneider sought a declaratory judgment that, *inter alia,* (1) Yoshina and Kimura had failed to follow the procedures in the Hawai'i Constitution, article XVII, sections 2 and 3 regarding publication and disclosure of the amendment, and (2) the LRB voter education material regarding the amendment was factually incorrect, misleading, and prevented an informed and deliberate vote by the plaintiffs and the electorate. Watland and Schneider also sought to enjoin Yoshina, *inter alia,* from submitting the amendment to the voters in the general election by public notices informing the electorate not to cast votes on Question No. 3 and from counting or tabulating any votes cast on Question No. 3.

On October 25, 2002, Watland and Schneider moved for a temporary restraining order in the circuit court suit to enjoin tabulation of the vote on the proposed amendment. Following an October 31, 2002 hearing on the matter, the circuit court, the Honorable Dexter D. Del Rosario presiding, took the matter under advisement, but requested that, in the meantime, the Office of Elections voluntarily publish the full text of the amendment in a newspaper of general circulation. On November 1, 2002, the circuit court denied Watland and Schneider's motion for a temporary restraining order in the circuit court suit. That same day, Watland and Schneider filed a notice of appeal from the circuit court's November 1, 2002 order, together with an emergency motion for a temporary restraining order, which was docketed under appeal No. 25410. On November 4, 2002, this court denied the emergency motion based upon lack of appellate jurisdiction.[5] This court's November 4, 2002 order provided, however, that "[t]he denial of the motion is without prejudice to the completion of the underlying circuit court case and entry of judgment and without prejudice to an election contest filed in accordance with law."

Meanwhile, on October 26, 2002 and October 28, 2002, then-Clerk of the Senate, Paul Kawaguchi, arranged for the full text of S.B. No. 996, which included the text of the amendment, to be published in the Honolulu Star Bulletin. Accordingly, S.B. No. 996 appeared as part of the legislature's "Notice of Proposed Constitutional Amendments to the Constitution of the State of Hawai'i" in the Wednesday, October 30, 2002, Friday, November 1, 2002, Sunday, November 3, 2002, and Monday, November 4, 2002 editions of the Honolulu Star Bulletin. Additionally, in response to Judge Del Rosario's request in the circuit court suit regarding publication, Yoshina had the full text of the amendment published in the Honolulu Star Bulletin on November 3 and 4, 2002. Yoshina also arranged for the full text of the amendment to be enlarged and printed as newspaper page-sized posters and posted at walk-in absentee polling places on November 1 and 2, 2002, and at every polling place on general election day.

On November 5, 2002, 385,462 registered voters turned out to vote in the general election. The Office of Elections' final report tabulating the votes in the general election reflects that 57.3% of the voters approved the amendment.[6]

*individually and in his official capacity, and Wendall Kimura, Acting Director of the State of Hawai'i Legislative Reference Bureau, individually and in his official capacity.*

5. Specifically, this court held:

[I]t appears that (1) [Watland and Schneider] are appealing from an order denying a motion for a temporary restraining order and ask the court to issue an injunction related to the restraining order; (2) it is well-settled that the right to appeal is purely statutory and exists only when given by some constitutional or statutory provision. *Burke v. County of Maui,* 95 Hawai'i 288, 289, 22 P.3d 84, 85 (2001); *Oppenheimer v. AIG Hawai'i Ins. Co.,* 77 Hawai'i 88, 91, 881 P.2d 1234, 1237 (1994);

*Chambers v. Leavey,* 60 Haw. 52, 57, 587 P.2d 807, 810 (1978); (3) HRS § 641–1(a) governs this appeal and provides in relevant part that appeals shall be allowed in civil matters, from all final judgments, orders or decrees of circuit courts; (4) the order being appealed is not a final judgment, and the circuit court did not grant [Watland and Schneider] leave to take an interlocutory appeal; and (5) no exception to the final judgment rule applies in this case. We also note that on January 24, 2003, this court dismissed appeal No. 25410 for lack of appellate jurisdiction.

6. We note that two additional constitutional amendments appearing on the ballot as Question Nos. 1 and 2 were approved by 83.9% and 59.7% of the voters, respectively.

On November 22, 2002, the plaintiffs filed this original proceeding, alleging (1) that the defendants' failure to follow the prescribed procedures set forth in article XVII, sections 2 and 3 of the Hawai'i Constitution invalidates ratification of the amendment (Count I), and (2) violations of due process rights guaranteed by the fourteenth amendment to the United States Constitution (Count II). On December 2, 2002, the defendants moved to dismiss the complaint, which this court denied. On January 8, 2003, the defendants moved for leave to file a factual record. On January 22, 2003, this court denied the defendants' motion, instructing in pertinent part that the parties could append relevant evidence as exhibits to their respective briefs. This court's January 22, 2003 order further stated that, although we had jurisdiction to consider the election challenge, we did not have original jurisdiction to consider Count II of the complaint.[7]

## II. *STANDARD OF REVIEW*

 Inasmuch as we accepted original jurisdiction of this matter,[8] there is no standard of review as such. *See Blair v. Cayetano,* 73 Haw. 536, 541, 836 P.2d 1066, 1069, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). However, this court has stated that:

[C]onstitutional amendments ratified by the electorate will be upheld unless they can be shown to be invalid beyond a reasonable doubt. *Keenan v. Price,* 68 Idaho 423, 195 P.2d 662 (1948); *City of Raton v. Sproule,* 78 N.M. 138, 429 P.2d 336 (1967). The burden of showing this invalidity is upon the party challenging the results of the election. And "[e]very reasonable presumption is to be indulged in favor of a constitutional amendment which the people have adopted at a general election." *City of Glendale v. Buchanan,* [195 Colo. 267] 578 P.2d 221, 224 (Colo.1978). In *Keenan*

[,] the court, quoting from *State v. Cooney,* 70 Mont. 355, 225 P. 1007, 1009 (1924), said:

"[H]ere as always we enter upon a consideration of the validity of a constitutional amendment after its adoption by the people with every presumption in its favor: The question is not whether it is possible to condemn the amendment, but whether it is possible to uphold it, and we shall not condemn it unless in our judgment its nullity is manifest beyond a reasonable doubt." 195 P.2d at 667.

A corollary to the foregoing principle is the oft-stated proposition that "[t]he people are presumed to know what they want, to have understood the proposition submitted to them in all of its implications, and by their approval vote to have determined that [the] amendment is for the public good and expresses the free opinion of a sovereign people." *Larkin v. Gronna,* 69 N.D. 234, 285 N.W. 59, 63 (1939).

*Kahalekai v. Doi,* 60 Haw. 324, 331, 590 P.2d 543, 549 (1979).

Moreover,

where it is alleged that the legislature has acted unconstitutionally, this court "[has] consistently held ... that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt.... [T]he infraction should be plain, clear, manifest, and unmistakable." *Schwab v. Ariyoshi,* 58 Haw. 25, 31, 564 P.2d 135, 139 (1977) (citations omitted).

*Blair,* 73 Haw. at 541–42, 836 P.2d at 1069 (brackets and internal ellipses points in original); *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997). The interpretation of article XVII, sections 2 and 3, is a question of law. *See Bronster,* 84 Hawai'i at 186, 932 P.2d at 323; *Pray v. Judicial Selection Comm'n,* 75 Haw. 333,

---

7. Count II of the complaint was therefore dismissed.

8. This court's January 22, 2003 order stated in pertinent part that:

[T]his court has jurisdiction to consider the election challenge pursuant to HRS chapter 11, Part XI, and HRS § 602–5(7), *see Kahale-*

*kai v. Doi,* 60 Haw. 324, 330–31, 590 P.2d [543,] 548–49 (1979) (in an original proceeding challenging the results of a general election dealing with amendments to the constitution, this court has jurisdiction pursuant to HRS chapter 11, Part XI, the election contest statute, and HRS § 602–5(7))[.]

340, 861 P.2d 723, 727 (1993). Therefore, the plaintiffs have the burden of demonstrating that there was a plain, clear, manifest, and unmistakeable violation of the procedure set forth in article XVII, sections 2 and 3 of the Hawai'i Constitution. *See Blair*, 73 Haw. at 542, 836 P.2d at 1070; *Bronster*, 84 Hawai'i at 186, 932 P.2d at 323; *Pray*, 75 Haw. at 340–41, 861 P.2d at 727.

## III. *DISCUSSION*

### A. *Nature of the Election Contest, Laches*

#### 1. *Nature of the Election Contest*

■ Relying upon this court's decision in *Akaka v. Yoshina*, 84 Hawai'i 383, 935 P.2d 98 (1997), the defendants assert that this original proceeding should be dismissed inasmuch as the plaintiffs' complaint and opening brief do not satisfy the requirements for bringing an election contest. Specifically, the defendants contend that the plaintiffs "must demonstrate both in their complaint and argument that 'the specific acts and conduct of which they complain would have had the effect of changing the results of the primary election.'" (Citing *Elkins v. Ariyoshi*, 56 Haw. 47, 49, 527 P.2d 236, 237 (1974)). The defendants further assert that:

> [Plaintiffs] must "prove" by admissible evidence, including affidavits or sworn statements from *actual voters*, that voters in fact did not read the full text of the amendment when it was published in the Honolulu Star Bulletin on October 30, and November 1, 3, and 4, 2002, that they would have read the full text if, in addition to these publications, it had also been published at least once in the two weeks immediately preceding the weeks of October 28 and November 3, and, most critically, that they would *not* have voted "Yes." They must also establish by admissible evidence from at least 28,100 [9] of the 220,829 voters who voted "Yes," that they would have

either voted "No" or left their ballots blank.

(Emphasis in original.)

Inasmuch as the defendants mischaracterize the nature of the instant election contest, we disagree. In *Akaka*, two incumbent candidates sued state election officials, challenging their respective defeats in a special election for the office of Trustee for the Office of Hawaiian Affairs (OHA). 84 Hawai'i at 384–85, 935 P.2d at 99–100. The plaintiffs claimed that the chief election officer and the office of elections did not properly obtain or handle the OHA ballots and that, as a result, "(1) the votes could not be properly counted[,] and (2) the OHA election results could not be properly certified." *Id.* at 384, 935 P.2d at 99. In reviewing the plaintiffs claims, the *Akaka* court observed:

> We have held that a complaint challenging the results of an election pursuant to HRS § 11–172 fails to state a·claim unless: (1) the plaintiffs demonstrate errors that would change the outcome of the election, *Elkins v. Ariyoshi*, 56 Haw. 47, 48, 527 P.2d 236, 237 (1974) (per curiam); *Funakoshi v. King*, 65 Haw. 312, 314, 651 P.2d 912, 913 (1982) (per curiam); *Lewis v. Cayetano*, 72 Haw. 499, 504, 823 P.2d 738, 741 (1992); or (2) the plaintiffs demonstrate that the correct result cannot be ascertained because of a mistake or fraud on the part of the precinct officials. HRS § 11–174.5(b).

*Id.* at 387, 935 P.2d at 102. Applying this standard, the *Akaka* court held that the plaintiffs had failed to meet their burden of demonstrating either of the foregoing circumstances.

*Akaka*, however, is inapposite to the instant case. Unlike *Akaka*, this is not a typical election contest wherein a complainant challenges the results of an election pursuant to HRS § 11–172 (1993).[10] Rather, the na-

---

**9.** In a footnote, the defendants state:

A total of 385,462 votes were cast at the 2002 general election. At least 192,732 "Yes" votes, or more than 50% of the 385,462 total votes cast, needed to be cast to ratify the amendment presented by Ballot Question 3....

**10.** HRS § 11–172 states in relevant part:

**Contests for cause; generally.** With respect to any election, any candidate, or qualified political party directly interested, or any thirty voters of any election district, may file a complaint in the supreme court. The complaint shall set forth any cause or causes, such as but not limited to, provable fraud, overages, or underages, that could cause a difference in the election results....

ture of this case is more analogous to *Kaha-lekai* where, as here, the plaintiffs contested the validity of certain constitutional amendments on the ground that the amendments were not submitted to the electorate in the form and manner required by law.[11] 60 Haw. at 326, 590 P.2d at 546.

■ Initially, we point out that the *Kahalekai* court based its jurisdiction over the subject matter of the original proceeding upon both HRS chapter 11, Part XI, and HRS § 602–5(7). *Id.* at 330–31, 590 P.2d at 548–49.[12] However, notwithstanding that the *Kahalekai* court held that its *jurisdiction* over that election contest was based in relevant part on HRS chapter 11, Part XI, the *Kahalekai* court did not apply HRS § 11–172, or any other provision of HRS chapter 11, Part XI, in reaching *the merits* of the plaintiffs' claims.[13] Indeed, the *Kahalekai* court was "guided by the cardinal principle of judicial review that constitutional amendments ratified by the electorate will be upheld unless they can be shown to be invalid beyond a reasonable doubt." 60 Haw. at 331, 590 P.2d at 549; *see also Bronster*, 84 Hawai'i at 186, 932 P.2d at 323 (quoting *Kahalekai*, 60 Haw. at 331, 590 P.2d at 549); *cf. Blair*, 73 Haw. at 542, 836 P.2d at 1069 ("every enactment of the legislature is pre-

sumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt").

As in *Kahalekai*, the plaintiffs in this case raise questions of procedure regarding an amendment to the Hawai'i Constitution. In their complaint, the plaintiffs allege in pertinent part that:

61. The provisions of Article XVII, Sections 2 and 3 of the Hawai'i State Constitution are not merely directory but are mandatory.

62. The provisions of Article XVII, Sections 2 and 3 of the Hawai'i State Constitution relating to publication in newspapers and provision to public libraries of the text of the amendment are unambiguous.

63. Strict observance of every substantial requirement of the amendment procedure is essential to the validity of the proposed amendment.

64. The defendants failed to follow, strictly or substantially, prescribed procedures unambiguously set forth in the Article XVII, Sections 2 and 3.

65. The defendants' failure to follow Article XVII's prescribed procedures invalidates ratification of the amendment.

---

11. Specifically, the plaintiffs in that case took issue with the form of the ballot on which the constitutional amendments appeared, asserting that it was so irregular as to require invalidation of the election. *Kahalekai*, 60 Haw. at 332, 590 P.2d at 549. The plaintiffs also argued that the electorate was deprived of necessary information concerning the proposed amendments. *Id.* at 339, 590 P.2d at 553. We point out that the amendments were presented to and approved by the electorate in the November 7, 1978 general election following the 1978 Constitutional Convention. *Id.* at 326, 590 P.2d at 546.

12. As previously noted, we have also based our jurisdiction to consider the present election challenge on HRS chapter 11, Part XI, and HRS § 602–5(7), citing *Kahalekai*. *See supra* note 8. We emphasize that HRS chapter 11, Part XI, which deals with election contests, clearly "vests in this court jurisdiction over the subject matter of this action." *Kahalekai*, 60 Haw. at 330, 590 P.2d at 548. Pursuant to HRS § 602–5(7) (1993), this court has jurisdiction and powers

[t]o make and award such judgments, decrees, orders and mandates, issue such executions and other processes, and do such other acts

and take such other steps as may be necessary *to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it.*
(Emphasis added.) Moreover, HRS § 602–5(6) (1993) provides that this court shall have jurisdiction and powers "[t]o make or issue any order or writ necessary or appropriate *in aid of its appellate or original jurisdiction,* and in such case any justice may issue a writ or an order to show cause returnable before the supreme court[.]" (Emphasis added.) We clarify that, although neither HRS § 602–5(6) nor HRS § 602–5(7) provide an independent statutory ground for jurisdiction over the instant election contest, there is no question that both provisions, when considered together with HRS chapter 11, Part XI, support this court's jurisdiction and powers in the instant case.

13. Ultimately, the *Kahalekai* court held that certain procedural flaws were fatal to some of the amendments, pointing to amendatory deletions and additions of a substantive nature that were not mentioned in both the informational booklet and newspaper supplement disseminated statewide in connection with the proposed amendments. *See id.* at 340–42, 590 P.2d at 554–56.

This is not, therefore, a typical election contest in that the plaintiffs, in challenging the validity of the amendment, essentially question the propriety of the Office of Elections placing the amendment on the ballot in the first instance. In light of the nature of this election contest, defendants' contention that the complaint should be dismissed lacks merit.

### 2. Laches

■ This court has stated that, in the context of an election contest, "[t]he general rule is that[,] if there has been opportunity to correct any irregularities in the election process or in the ballot prior to the election itself, plaintiffs will not, in the absence of fraud or major misconduct, be heard to complain of them afterward." *Lewis v. Cayetano*, 72 Haw. 499, 502–03, 823 P.2d 738, 741 (1992) (quoting *Thirty Voters v. Doi*, 61 Haw. 179, 181, 599 P.2d 286, 288 (1979) [hereinafter, *Doi*]). The defendants contend that this equitable doctrine of laches bars the plaintiffs' suit, relying upon our decisions in *Doi* and *Lewis*. Specifically, the defendants assert that, up until the plaintiffs brought the October 23, 2002 circuit court suit, the

> plaintiffs had the benefit of more than four months to review the voter education material the LRB prepared,[14] and at least two weeks notice of the fact that the full text of any legislatively proposed amendment to the State Constitution could not be published in four successive weeks within two months of the election [pursuant to article XVII, section 3] because at the latest, the first of such four publications would have to have been made at least two weeks earlier.
>
> . . . .

The plaintiffs, on the other hand, respond that this case was not ripe until the date the defendants published the voter information pamphlet, or October 13, 2002, pointing out that the circuit court suit was filed within ten

days thereof on October 23, 2002. Moreover, the plaintiffs note that "[i]t was ... not until October 14, 2002 that the Attorney General's Office announced by letter to Mr. [Brook] Hart that it intended to defend the voter information pamphlet." The plaintiffs, citing *Bronster*, 84 Hawai'i at 185, 932 P.2d at 322, argue that, regardless, "the doctrine of laches in election contests is inapplicable to post-election procedural challenges to ratification."

At the outset, we point out that *Bronster* is not dispositive in this case. In *Bronster*, the attorney general filed a post-election suit in circuit court, challenging the validity of eight constitutional amendments that were submitted to the voters in a general election. 84 Hawai'i at 182, 932 P.2d at 319. Specifically, the attorney general alleged that the legislature had submitted the amendments to the voters without proper notice to the governor, in violation of article XVII, section 3 of the Hawai'i Constitution. *Id.* at 181 82, 932 P.2d at 318–19. The circuit court dismissed the complaint for lack of subject matter jurisdiction, ruling in pertinent part that the State's cause of action was an "election contest" under HRS chapter 11 that had to be brought as an original proceeding before this court. *Id.* at 182, 932 P.2d at 319.

On appeal, the *Bronster* court disagreed that the cause of action was an election contest, stating:

> It is true that HRS Chapter 11 is more specific than the general jurisdictional provisions empowering the circuit courts. But it does not divest those courts of jurisdiction over causes of action which do not fall within its ambit. HRS section 11–172 governs challenges to election *results;* this case raises a question of constitutional *procedure.* The attorney general does not "contest" an "election," but rather seeks to resolve the meaning of a constitutional provision pursuant to which the legislature may propose amendments to the constitu-

**14.** In a footnote, the defendants point to the fact that Yoshina had received the LRB voter education material on July 5, 2002 as evidence that the plaintiffs had four months' notice of the substance thereof. *See* **AB at 21 n. 17.** The defendants assert further that:

> But even if the plaintiffs did not know that Mr. Yoshina had received the material early, the LRB was statutorily required to submit the material to the Chief Election Officer under [HRS] § 11–2.5(e) no later than ninety days before the general election or by August 7, 2002.

tion and place them before the voters. The fact that such a dispute comes before the courts subsequent to the election at which the disputed amendments were voted upon does not convert the dispute into a "contest" over the result of that election.

*Id.* at 184, 932 P.2d at 321 (emphases in original). The *Bronster* court held, therefore, that the circuit court had jurisdiction under HRS § 603–21.5 to consider the complaint. *Id.* Additionally, in rejecting the defendants' contention that the attorney general's suit was barred by laches, the *Bronster* court stated that "[f]or substantially the same reasons that we have held this action not to be an 'election contest,' . . . th[e] doctrine [of laches] does not apply to the present case." *Id.* at 185, 932 P.2d at 322.

As in *Bronster*, the plaintiffs in the instant action raise questions of constitutional procedure. Unlike in *Bronster*, however, this court has clearly characterized the instant action as an election contest, albeit not a typical election contest customarily governed by HRS § 11–172. *See* discussion *supra* Section III.A.1. *Bronster* is, therefore, inapposite.

We now turn to examine the defendants' contention that laches bars the present suit based on *Doi* and *Lewis*. In *Doi*, this court found that the plaintiffs had at least one month's constructive notice of the ballot form with which they took issue. 61 Haw. at 182, 599 P.2d at 288. Inasmuch as the plaintiffs had failed altogether to act prior to the election to correct any alleged errors in the ballot form, this court held that they were barred from obtaining any relief after the election. *Id.* at 182, 599 P.2d at 289. In *Lewis*, this court found that, "between October 5, 1990 and November 6, 1990, the plaintiffs had notice of the form of the ballot" with which they took issue. 72 Haw. at 503, 823 P.2d at 741. Notwithstanding that the plaintiffs lodged objections with both the county clerk and lieutenant governor prior to the election, the *Lewis* court held:

> We apply the doctrine of laches in cases such as this and *Thirty Voters v. Doi* because efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process.
>
> Merely notifying elections officials of irregularities is not sufficient. . . .

*Id.*

The facts presented in this case are, however, clearly distinguishable from the facts in *Doi* and *Lewis*. Unlike in either *Doi* or *Lewis*, the plaintiffs in this case *did* seek judicial relief to correct perceived irregularities in the election process by filing the circuit court suit *prior* to the election. Therefore, this is not a case where the plaintiffs "gamble[d] on the outcome of the election contest [and] then challenge[d] it when dissatisfied with the results[.]" *Id.*

The defendants posit that "[t]he fact that plaintiffs sued before the election is a distinction without a difference[,]" vaguely reasoning:

> Even if the plaintiffs had secured the temporary restraining order they sought, the timing of plaintiffs' suit left both the courts and the State Defendants' [sic] with no meaningful time within which to make corrections. For all intents and purposes, the plaintiffs sandbagged the voters of the State of Hawai'i by waiting until it was clearly too late for any corrections to be made before bringing suit.

This argument is specious.

As previously indicated, the defendants specifically take issue with the timeliness of the plaintiffs' claims regarding the inaccuracies in the LRB voter education material and Yoshina and Kimura's failure to follow the publication requirements of article XVII, section 3 of the Hawai'i Constitution. With respect to the former claim, the evidence in this case indicates that October 13, 2002 was the first publication date of the LRB voter education material (which as previously indicated did not include the text of the amendment) in a newspaper of general circulation.[15]

15. As previously indicated, the Office of Elec-

tions reformatted the LRB voter education mate-

Consequently, we hold that October 13, 2002 is the earliest date that the plaintiffs can be construed to have been put on constructive notice of the contents of the voter information pamphlet. Inasmuch as the plaintiffs filed the circuit court suit on October 23, 2002, within 10 days of being put on constructive notice, we hold that the circuit court suit was timely filed as to this claim. *See Doi*, 61 Haw. at 182, 599 P.2d at 289 ("This court has heretofore stated ... that ... a period of slightly more than one week is 'ample time' in which to judicially compel changes in an improper ballot." (Citing *Johnston v. Ing*, 50 Haw. 379, 382, 441 P.2d 138, 140 (1968))).

As for the latter claim relating to publication, the publication provision of article XVII, section 3 of the Hawai'i Constitution requires in pertinent part that a proposed amendment be "published once in each of four successive weeks in at least one newspaper of general circulation ... within the two months' period immediately preceding the next general election." (Quoted in its entirety, *infra*, note 17.) As applied in this case, Tuesday, October 15, 2002 was the latest date by which the first of the four publications was required to have occurred prior to the November 5, 2002 general election. Therefore, the plaintiffs would

not have known of the defendant's inability to comply with the publication requirement of article XVII, section 3, until the close of business on October 15, 2002. However, even if the plaintiffs had filed a complaint in circuit court on October 16, 2002, the alleged publication violations were simply not of a nature that could have been "corrected" prior to the general election. More specifically, assuming the merit of the plaintiffs' publication claim, once October 15, 2002 passed, it was literally no longer possible for the defendants to publish the amendment "once in each of four successive weeks" prior to the November 5, 2002 general election. Under these circumstances, laches cannot bar the plaintiffs' suit.

B. *Publication and Disclosure Requirements of Article XVII, Sections 2 and 3*

As previously indicated, the plaintiffs contend that the ratification process was procedurally flawed because of the defendants' failure to comply, either strictly or substantially, with constitutional requirements regarding publication and disclosure of the amendment's text.

Article XVII, sections 2 and 3 of the Hawai'i Constitution [16] set forth a specific proce-

---

rial and published it as a public notice advertisement in the Honolulu Advertiser and Honolulu Star Bulletin on October 13, 20, and 27, and November 3, 2002.

**16.** Article XVII, section 3 of the Hawai'i Constitution states:

The legislature may propose amendments to the constitution by adopting the same, in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, by a majority vote of each house on final reading at each of two successive sessions.

Upon such adoption, the proposed amendments *shall* be entered upon the journals, with the ayes and noes, *and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election.*

At such general election the proposed amendments shall be submitted to the elector-

ate for approval or rejection upon a separate ballot.

*The conditions of and requirements for ratification of such proposed amendments shall be the same as provided in section 2 of this article for ratification at a general election.*
(Emphases added.)

Article XVII, section 2 of the Hawai'i Constitution provides in relevant part that:
RATIFICATION; APPROPRIATIONS

The convention shall provide for the time and manner in which the proposed constitutional revision or amendments shall be submitted to a vote of the electorate; provided that each amendment shall be submitted in the form of a question embracing but one subject; and provided further, that each question shall have designated spaces to mark YES or NO on the amendment.

*At least thirty days prior to the submission of any proposed revision or amendments, the convention shall make available for public inspection, a full text of the proposed amendments. Every public library, office of the clerk of each county, and the chief election officer shall be provided such texts and shall make them available for public inspection.* The full text of any proposed revision or amendments shall also be

dure for the proposal and ratification of constitutional amendments. With respect to publication, the Hawai'i Constitution expressly provides that: (1) once adopted by the legislature, the proposed amendment shall be "published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election[,]" article XVII, section 3, and (2) "[e]very public library, office of the clerk of each county, and the chief election officer shall be provided [the full text of the proposed amendment] and shall make [it] available for public inspection[,]" article XVII, section 2.

In the instant case, it is undisputed that the text of the amendment was not published in any newspaper of general circulation until October 30, 2002, just six days prior to the November 5, 2002 general election rather than for four successive weeks prior to the election as required by article XVII, section 3. In addition, it is undisputed that the text of the amendment was never provided to the public libraries as required by article XVII, section 2. Thus, the defendants clearly failed to comply with article XVII, sections 2 and 3.

Notwithstanding these deficiencies, the defendants argue in pertinent part that:

> Even though Article XVII literally states that the full text of a proposed constitutional amendment "shall" be made available to the voters by various means, a constitutional amendment approved by the voters will not be declared invalid just because the full text of the amendment was not made available as the constitution specifies[.]

Relying upon *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 931 P.2d 580 (1997), the defendants point out that "[i]n

this jurisdiction, 'shall' can sometimes be 'may,' and thus cannot be presumed to be mandatory in its effect." This argument lacks merit.

■■■■ In interpreting constitutional provisions, "[t]he general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written." *Blair*, 73 Haw. at 543, 836 P.2d at 1070 (quoting *Spears v. Honda*, 51 Haw. 1, 6, 449 P.2d 130, 134 (1968)). "In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them." *Hawai'i State AFL–CIO v. Yoshina*, 84 Hawai'i 374, 376, 935 P.2d 89, 91 (1997) (citing *Pray*, 75 Haw. at 342, 861 P.2d at 727). Furthermore, inasmuch as this case involves a constitutional provision that "sets forth a specific procedure for amending the constitution itself[,]" *Blair*, 73 Haw. at 543, 836 P.2d at 1070 (interpreting a different provision of article XVII, section 3 of the Hawai'i Constitution), the following principles apply:

> *[T]he provisions of a constitution which regulate its own amendment are not merely directory, but mandatory.* "[S]trict observance of every substantial requirement is essential to the validity of the proposed amendment." *Andrews v. Governor of Maryland*, 294 Md. 285, 289, 449 A.2d 1144, 1146 (1982) (citation omitted); *see also Coleman v. Pross*, 219 Va. 143, 154, 246 S.E.2d 613, 620 (1978); *McWhirter v. Bridges*, 249 S.C. 613, 618, 155 S.E.2d 897, 899 (1967); *Moore v. Brown*, 350 Mo. 256, 263, 165 S.W.2d 657, 659-60 (1942) ("[I]t is fundamental that the people, themselves, are bound by their own Constitution[.]

made available for inspection at every polling place on the day of the election at which such revision or amendments are submitted.

The convention shall, as provided by law, be responsible for a program of voter education concerning each proposed revision or amendment to be submitted to the electorate.

The revision or amendments shall be effective only if approved at a general election by a majority of all the votes tallied upon the question, this majority constituting at least fifty per

cent of the total vote cast at the election, or at a special election by a majority of all the votes tallied upon the question, this majority constituting at least thirty per cent of the total number of registered voters.

The provisions of this section shall be self-executing, but the legislature shall make the necessary appropriations and may enact legislation to facilitate their operation.

(Emphases added.)

Where they have provided therein a method for amending it, they must conform to that procedure. Any other course would be *revolutionary* ...." (emphasis in original)).

*Id.* at 543–44, 836 P.2d at 1070 (emphasis added).

■ We hold that the publication and disclosure language of article XVII, sections 2 and 3 of the Hawai'i Constitution is clear and unambiguous; therefore, it must be construed as written. *Id.* at 543, 836 P.2d at 1070. Furthermore, insofar as the publication and disclosure requirements of article XVII, sections 2 and 3 clearly regulate amendments to the constitution, these provisions "are not merely directory, but mandatory." *Id.*

Still, the defendants posit that this court's decision in *Kahalekai* "suggests that [the words] 'shall publish,' 'shall be provided,' 'shall be made available' will not be construed so strictly as to cast a blind eye to how voters actually inform themselves in a particular election." Asserting that the electorate was informed about all aspects of the amendment, the defendants state in pertinent part that:

> Like the voters in *Kahalekai* and as noted earlier, the voters here had the benefit of extensive media coverage of the issue. Numerous organizations weighed, for and against Ballot Question 3. Declaration of Peter B. Carlisle. The voters were "fairly and sufficiently advised." Taken together, "these means and sources, ... could have reasonably educated and familiarized [the voter] with the significance and substance of ... the proposed amendment [ ]...." 60 Haw. at 340, 590 P.2d at 554.

We cannot agree. First, the publication requirement of article XVII, section 3 was not implicated in *Kahalekai*, which dealt with convention, not legislatively, initiated amendments. In assessing "whether the results of the election c[ould] be said to have been the mandate of an informed electorate[,]" the *Kahalekai* court pointed out:

Article XV, section 3, of the present Constitution, *requires that legislatively initiated proposals be published* "once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such newspaper is published, within the two months' period immediately preceding the next general election." .... *There is no such requirement imposed for convention initiated amendments.*

60 Haw. at 339, 590 P.2d at 553 (emphases added) (footnote omitted).

The *Kahalekai* court did go on to state that the convention was required, albeit not constitutionally, "to inform the public of the contents and effect of the proposed amendments[,]" and "[c]orrelatively, ... it was incumbent upon members of the public to educate and familiarize themselves with the contents and effect of the proposed amendments before expressing themselves at the polls." *Id.* (Citations omitted.) The *Kahalekai* court pointed out, *inter alia*, that the amendments had been given extensive newspaper, radio, and television coverage, summaries of the amendments were published in the newspapers, as well as in a "Con–Con Summary" that was mailed by the Convention to the residence of every registered voter in the State, and an advertising supplement that purported to contain the full text of the amendments was distributed through the newspapers in every county. It was, nonetheless, only in the context of reviewing a challenge to convention initiated amendments to which the publication requirement of then-article XV, section 3 did not apply that the *Kahalekai* court reached the holding relied upon by the defendants. *See id.* at 340, 590 P.2d at 553–54.

Second, we point out that, at the time *Kahalekai* was decided in 1979, the provisions of article XV, section 2 of the Hawai'i Constitution [17] did not contain any requirement that the convention make available for public inspection (at the public libraries or otherwise) the full text of proposed amendments. In 1980, the legislature amended those provisions, to, *inter alia*, "specify pro-

---

17. Following the approval of various amendments to the Hawai'i Constitution in the Novem-

ber 7, 1978 general election, article XV was renumbered as article XVII.

cedures to be followed upon submission of proposed constitutional amendments or revisions to the public for voter ratification." Conf. Com. Rep. No. 2–80, in 1980 Senate Journal, at 937. Therefore:

> The manner of voter education has ... been specified to *require* the Constitutional Convention to make available for public inspection the full text of any proposed amendment for revision at every public library, office of the county clerk, and the office of the chief election officer, as well as at every polling place on election day.

*Id.* (emphasis added). Based upon the foregoing, the defendants' reliance upon *Kahalekai* is unavailing.

■ As previously stated, we hold that the publication and disclosure requirements of article XVII, sections 2 and 3 of the Hawai'i Constitution are mandatory in nature. A question that appears to remain is whether this court should construe the publication and disclosure requirements of article XVII, sections 2 and 3 to be "substantial requirement[s]" dictating "strict observance." However, in light of the facts in this case that reflect the defendants' complete disregard of the procedural mandate of article XVII, sections 2 and 3, we are compelled to conclude that the amendment cannot be upheld, irrespective of the issue whether strict observance of the publication and disclosure provisions of article XVII, sections 2 and 3 is required.

As previously indicated, it is undisputed that (1) the defendants failed altogether to provide the text of the amendment to the public libraries, in violation of the mandate of article XVII, section 2, and (2) the amendment was not published in any newspaper of general circulation until less than a week prior to the general election,[18] in violation of the mandate of article XVII, section 3. Further, the defendants admit that they only

arranged for the amendment to be published in the Honolulu Star Bulletin on November 3 and 4, 2002 in response to Judge Del Rosario's request in the circuit court suit that they voluntarily do so. Under these facts, extensive media coverage of the amendment can neither substitute for the notice mandated by the fundamental law of this state nor excuse the defendants' complete failure to abide by that mandate. "The people have a right to have the proper submission of any amendment they desire. They have both the right and the duty to see that it is lawfully done, and it is the duty of the court to look respectively to the preservation of the right and performance of the duty." *State ex rel. Hall v. Cline,* 118 Neb. 150, 224 N.W. 6, 9 (1929). Accordingly, we hold that the plaintiffs have met their burden of demonstrating a plain, clear, manifest, and unmistakable violation of the procedure set forth in article XVII, sections 2 and 3 of the Hawai'i Constitution.[19]

## IV. CONCLUSION

Based upon the foregoing, we hold that the amendment was not validly ratified.

### Concurring Opinion by ACOBA, J.

Inasmuch as the matters set forth herein were largely raised in S.Ct. No. 25410 in November 2002, *see* majority opinion at 132 and at n. 5, 85 P.3d at 1083, and at n. 5 and I believed that at that time (1) this court had jurisdiction to hear the appeal in No. 25410, (2) there was a substantial likelihood that Plaintiffs[1] would prevail because of Defendant Yoshina's violation of Hawai'i Constitution article XVII, section 3 and therefore, (3) a temporary restraining order (TRO) should issue to enjoin the tabulation and certification of the voting results pending a decision of the merits (*see* dissenting opinion in S.Ct. 25410), I concur in the majority's ultimate holding that the amendment was not validly

---

18. As previously indicated, S.B. No. 996 appeared as part of the legislature's "Notice of Proposed Constitutional Amendments to the Constitution of the State of Hawaii" in the Wednesday, October 30, 2002, Friday, November 1, 2002, Sunday, November 3, 2002, and Monday, November 4, 2002 editions of the Honolulu Star Bulletin.

19. As previously noted, inasmuch as the plaintiffs' first contention is dispositive, it is unnecessary to address the plaintiffs' remaining contention.

1. Plaintiffs A. Joris Watland and Eric Gene Schneider in the present case were the plaintiffs in S.Ct. No 25410.

ratified. Majority opinion at 141, 85 P.3d at 1092.

I write separately on two points. First, based on our precedent referred to in the discussion herein, this court should construe the publication and disclosure requirements of article XVII, sections 2 and 3 to be "substantial requirement[s]" dictating "strict observance." *Blair v. Cayetano,* 73 Haw. 536, 543, 836 P.2d 1066, 1070, *reconsideration denied,* 73 Haw. 536, 836 P.2d 1066 (1992). Thus, I do not feel "a question . . . appears to remain[,]" majority opinion at 141, 85 P.3d at 1092, surrounding these sections of article XVII. As much as our view of the proposed amendment must be content neutral, we must also ensure that the process by which an amendment is presented to the voters is procedurally correct.

Second, as mentioned, a TRO should have earlier issued against the tabulation and certification of this amendment, thereby avoiding the subsequent uncertainty generated by this litigation. Plaintiffs had raised substantial grounds to support a TRO, which grounds have ultimately, in the present case, led to invalidation of the voting results. It was important for the integrity of the voting process to ensure that the procedure by which the amendment was presented to the voters was correct, prior to tabulation and certification of the vote. Accordingly, for the reasons set forth below, preservation of the status quo (which had been the objective of the injunctive relief requested by Plaintiffs) pending an ultimate decision on the merits, would have been the better course.

## I.

As noted by the majority, on "November 4, 2002, this court denied the emergency motion [for a TRO,²] based upon lack of appellate jurisdiction." Majority opinion at 142, 85 P.3d at 1093. I believe this court had jurisdiction to grant the motion for a TRO, for we have supervisory jurisdiction of the trial courts under Hawai'i Revised Statutes § 602–4 (1993), when it is necessary " 'to prevent and correct errors and abuses there-

in where no other remedy is expressly provided for by law[.]' " *State v. Kealaiki,* 95 Hawai'i 309, 317, 22 P.3d 588, 596 (2001) (quoting *State v. Ui,* 66 Haw. 366, 367, 663 P.2d 630, 631 (1983)). Hence, in order to prevent such an error, a jurisdictional basis upon which to rely was available to this court.

## II.

In deciding whether to sustain a request for a TRO like the one filed, this court must balance the following considerations: 1) whether a plaintiff is likely to succeed on the merits; 2) whether the balance of irreparable harm favors the temporary injunctive relief; and 3) whether the public interest supports granting the temporary injunctive relief. *Life of the Land v. Ariyoshi,* 59 Haw. 156, 158, 577 P.2d 1116, 1118 (1978). In that light, I reiterate the relevant considerations.

## A.

In line with ·their prior request for a restraining order, Plaintiffs had shown a likelihood for success. The Hawai'i State Constitution plainly establishes the necessary procedures for a constitutional amendment:

> Upon such adoption, *the proposed amendments shall be entered upon the journals, with the ayes and noes, and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, within the two months' period immediately preceding the next general election.*
>
> *At such general election* the proposed amendments shall be submitted to the electorate for approval or rejection upon a separate ballot.

Hawai'i Const. art. XVII, § 3 (emphasis added). This court has construed the constitutional provisions to be mandatory and not merely directory. *Blair,* 73 Haw. at 543, 836 P.2d at 1070 ("[T]he provisions of a constitution which regulate its own amendment are

---

**2.** As noted by the majority, S.Ct. No. 25410 included both a notice of appeal from the circuit court's November 1, 2002 order and the emer-

gency motion for a temporary restraining order. Majority opinion at 142, 85 P.3d at 1093.

not merely directory, but mandatory."). Furthermore, this court has adopted a "strict observance" standard for procedural requirements relating to the ratification of an amendment. *Id.* ("[S]trict observance of every substantial requirement is essential to the validity of the proposed amendment." (Internal quotation marks and citations omitted.)). The constitution sets forth a single, straight-forward procedure for submission of a proposed amendment, as to which no ambiguity exists or dispute can reasonably arise. *See Bronster v. Yoshina,* 84 Hawai'i 179, 187, 932 P.2d 316, 324 (1997) ("We read the language of article XVII, section 3 as expressing a series of related, straightforward requirements pursuant to which the legislature may propose amendments to the Hawai'i Constitution.").

Defendant Yoshina had failed to publish the full text of the proposed amendment in a newspaper of general circulation in each senatorial district for four successive weeks in the two months prior to the election. Instead, Defendant undertook to publish the text only six days before the election, after a significant portion of the population may have already voted. Even if substantial compliance rather than strict compliance were considered the test, the actions Defendant took do not appear to be substantially compliant. Thus, at the time Plaintiffs applied for the TRO, it was evident that the "procedural mandate of article XVII, section 2 and 3" had been disregarded. Majority opinion at 141, 85 P.3d at 1092.

### B.

Although it may have been arguable whether adoption of the amendment would cause irreparable harm to Plaintiffs, it was contrary to the public interest to tabulate and certify the results when there was a substantial likelihood that Plaintiffs would ultimately prevail. The preservation of the status quo pending a decision on the merits could have been practicably and conceptually maintained in this case if tabulation[3] and official certification of the results were postponed. *See Bush v. Gore,* 531 U.S. 1046,

1047, 121 S.Ct. 512, 148 L.Ed.2d 553 (2000) (Scalia, J., concurring) ("Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires."). Because the status quo was not maintained, announcement of the vote count was clouded by the outstanding litigation. There was little reason, under such circumstances, to tabulate and certify the votes.

### C.

It may have been questionable whether Plaintiffs could have claimed injury if the proposal had been rejected. Nonetheless, the likely invalidity of the amendment process itself subverted the legitimacy of whatever outcome may have resulted. Thus, the public interest factor weighed heavily in favor of determining beforehand the question of procedural validity raised by Plaintiffs. The answer to that question would have determined whether tabulation and certification were necessary or warranted.

### III.

On balance, as viewed when Plaintiffs applied for it, the circumstances indicated a TRO should have issued with respect to tabulation and certification by Defendants. With all due respect, the public interest would have been best served by avoiding the uncertainty and the potential for voter frustration and confusion flowing from denial of the TRO.

*ORDER GRANTING IN PART AND DENYING IN PART MOTION TO CLARIFY, TO STAY FILING OF JUDGMENT, FOR EXPEDITED CONSIDERATION, AND FOR ORAL ARGUMENT*

In *Watland v. Lingle,* No. 25487, the plaintiffs, forty-six residents and registered voters in the State of Hawai'i, challenged in an original proceeding the validity of a constitutional amendment authorizing the initiation of felony prosecutions by written information

---

[3]. The facts did not indicate how tabulation was done. Tabulation should be enjoined only to the extent it would not prevent other election results from being counted.

[hereinafter, the amendment], which was presented to and approved by a majority of voters in the November 5, 2002 general election [hereinafter, the general election]. The plaintiffs contended that: (1) the ratification process was procedurally invalid inasmuch as the State defendants [hereinafter, the defendants] failed to comply with requirements set forth in the Hawai'i Constitution regarding publication and disclosure of the text of the amendment; and (2) the ratification process was fundamentally flawed (a) inasmuch as the defendants provided voters with misinformation regarding the amendment and (b) due to knowing misconduct by election officials.

On February 24, 2004, this court filed a published opinion in *Watland,* finding merit in the plaintiffs' first contention and holding that the amendment was not validly ratified in accordance with the mandate of article XVII, sections 2 and 3 of the Hawai'i Constitution. *Watland v. Lingle,* No. 25487, Op. at 130, 85 P.3d at 1081 (Haw. Feb. 24, 2004). On March 3, 2004, State defendants [1] [hereinafter, the defendants] filed a "Motion to Clarify, to Stay Filing of Judgment, for Expedited Consideration, and for Oral Argument" [hereinafter, motion for clarification], requesting:

an order which:

(1) Clarifies that because "this court has clearly characterized the instant action as an election contest, albeit not a typical election contest customarily governed by [Hawai'i Revised Statutes (HRS)] § 11–172," rather than a challenge to the process the Legislature used to propose an amendment to Article I, Section 10 of the State Constitution, *Watland v. Lingle,* 2004 WL 335159 at 8 [at 132, 85 P.3d at 1083] (Hawai'i), the ensuing remedy is publication of the full text of the proposed amendment and a redux of the 2002 general election on the ballot question that was

placed before the voters—Ballot Question 3—through the special election called-for in Haw.Rev.Stat. § 11–174.5, or one ordered pursuant to the inherent power of this Court to make orders "for the promotion of justice," under Haw.Rev.Stat. § 602–5(7); and

(2) Stays the filing of the judgment in this election contest until at least July 7, 2004, so that the special election that is held "to redux" the 2002 general election on Ballot Question 3 may be held in conjunction with the 2004 presidential and general election to minimize costs and place the proposed constitutional amendment before the largest group of voters.

We initially viewed defendants' motion as one seeking reconsideration of this court's opinion; however, upon further review, we agree that the motion is proper pursuant to HRAP Rule 27. Therefore,

IT IS HEREBY ORDERED that defendants' motion to clarify is granted as follows:

HRS § 11–174.5(b) does not apply to the present case. *See Watland,* Op. at 134, 85 P.3d at 1085 ("This is *not a typical election contest* wherein a complainant challenges the results of an election pursuant to HRS § 11–172 (1993)." (Emphasis added.)); *Watland,* Op. at 137, 85 P.3d at 1088 (repeating that the instant case "is *not a typical election contest* customarily governed by HRS § 11–172" (emphasis added)). Although this court ·based its *jurisdiction* over this election contest in relevant part on HRS chapter 11, Part XI,[2] and HRS §§ 602–5(6) and 602–5(7) (1993), this court, as in *Kahalekai v. Doi,* 60 Haw. 324, 590 P.2d 543 (1979), did *not* apply HRS § 11–172 or any other provision of HRS chapter 11, Part XI, in reaching *the merits* of the plaintiffs' claims. *See Watland,* Op. at 135, 137–141, 85 P.3d at 1086, 1088–1092. Additionally: (1) article XVII, section 3 of the Hawai'i Constitution clearly and

---

1. Following the automatic substitution of various parties during the pendency of this case pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2000), the current State defendants are Governor Linda Lingle, Dwayne D. Yoshina, in his official capacity as Chief Election Officer for the State of Hawai'i, and Ken H. Takayama, in his official capacity as Acting Di-

rector of the State of Hawai'i Legislative Reference Bureau.

2. This court did not, as the defendants erroneously state, base its jurisdiction over the instant matter on the specific provisions of HRS § 11–174.5.

unambiguously provides that proposed amendments must be adopted

in the manner required for legislation, by a two-thirds vote of each house on final reading at any session, after either or both houses shall have given the governor at least ten days' written notice of the final form of the proposed amendment, or, with or without such notice, by a majority vote of each house on final reading at each of two successive sessions.

[And,] [u]pon such adoption, the proposed amendments shall be entered upon the journals, with the ayes and noes, and published once in each of four successive weeks in at least one newspaper of general circulation in each senatorial district wherein such a newspaper is published, *within the two months' period immediately preceding* **the next general election**[;]

and (2) the general provisions of HRS § 11–174.5(b) mandating that a special election be held within 120 days after judgment in an election contest conflict on their face with the specific mandate of the Hawai'i Constitution regarding proposed amendments being considered in a general election. (Emphases added.) Accordingly, HRS § 11–174.5(b) cannot apply in the present matter. *See Blair v. Cayetano,* 73 Haw. 536, 543, 836 P.2d 1066, 1070, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992) (In interpreting constitutional provisions, "[t]he general rule is that, if the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written." `(Quoting *Spears v. Honda,* 51 Haw. 1, 6, 449 P.2d 130, 134 (1968)); *State v. Coney,* 45 Haw. 650, 662, 372 P.2d 348, 354 (1962) *overruled in part on other grounds,* 54 Haw. 385, 507 P.2d 1084 (1973) ("[W]here general provisions, terms or expressions in one part of a statute are inconsistent with more specific or particular provisions in another part, the particular provisions must govern or control.").

Finally, the remainder of defendants' motion is denied. Plaintiffs are directed to submit a proposed judgment forthwith.

Concurring Opinion by ACOBA, J.

Having concurred only in the result reached by the majority opinion, I respectfully take no position with respect to the explanatory language of the order but believe that the motion filed by the defendants should be denied.